UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 18-076-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MARVIN LEE FOXX, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

A federal grand jury returned an indictment against Marvin Lee Foxx in July 2018, charging him with possession with intent to distribute a mixture or substance containing fentanyl, despropionyl fentanyl, and cocaine. [Record No. 1, p. 1] The grand jury also charged Foxx with being a felon in possession of a firearm. *Id*. at 1-2. The matter is now pending for consideration of Foxx's motion to suppress a statement made to Lexington police officers at the time of his arrest. [Record No. 20] The statement sought to be suppressed concerns Foxx's knowledge of the subject firearm found at his home during a subsequent search of the residence.

For the reasons discussed below, the motion to suppress will be denied.

## I. BACKGROUND

A search warrant was issued on April 9, 2018, authorizing law enforcement to search Foxx's person, his residence at 245 Simba Way, Lexington, Kentucky, a 2015 Ford Fusion, and a 2002 Saturn for evidence relating to distribution of heroin and fentanyl. [Record No. 25, p. 1] Foxx was traffic stopped by three Lexington police officers (Officers Page, Eden and

McBride) in two marked vehicles the following morning at approximately 9:30 a.m.. [Record No. 20-1, p. 1]

Officers conducted surveillance at the residence on Simba Way and saw Foxx enter the 2015 Ford Fusion. [Record No. 25, p. 1-2] After following him for a short distance, Lexington police stopped Foxx on Woodhill Drive and directed him to exit the vehicle. *Id*. at 2. As the defendant exited the car, an officer asked Foxx whether he had a gun or a knife. [United States Exhibit 1, 1:43 (hereafter, "U.S. Ex. 1")] Following this inquiry, the defendant asked, "what was going on?" Police responded by advising Foxx that a warrant had been obtained to search his house. [U.S. Ex. 1, 1:55] Foxx then (initially and repeatedly) questioned the legitimacy of the search of his home, insisting to see the subject warrant. [U.S. Ex. 1, 2:00]

Officers began to search Foxx and found bags of suspected heroin, fentanyl, and/or crack cocaine. [Record No. 25, p. 2] The officers asked whether Foxx had "any guns, anything in the house, anything like that." [Record No. 20-1, p. 4; U.S. Ex. 1, 2:14] Foxx was placed in handcuffs and moved to a sidewalk. [Record No. 20-1, p. 3]

Before an officer could read Foxx his *Miranda* rights, the defendant asked if he needed a lawyer and asked to call a lawyer. [Record No. 25, p. 2-3; U.S. Ex. 1, 2:35] He then explicitly stated "I need a lawyer." [U.S. Ex. 1, 2:48] One of the officers began to advise Foxx of his *Miranda* rights, but was interrupted. [Record No. 25, p. 3] Thereafter, the officer asked the defendant if he had a gun on his person. *Id*. The defendant continued to challenge the impending search of his house. *Id*. at 4. Foxx was fully advised of his *Miranda* rights following this exchange and he affirmed that he understood the rights he had been read. *Id*. at 4.

Foxx responded to the *Miranda* warnings by stated that he was not going to answer questions and one officer confirmed that the defendant "invoked [his] right not to talk." *Id.* at 4. But notwithstanding this assertion, Foxx continued asking the officers about the search warrant for his residence. *Id.* He also contended that officers did not have a right to search his person and claimed he did not understand what was happening. Officers explained the search warrant and procedure to him, including the fact that detectives would provide Foxx with a copy of the search warrant and read its contents to him. [U.S. Ex. 1, 6:00] One of the officers discussed his past federal charges, asked questions about co-conspirators, and asked how much time he previously spent in prison. *Id.* at 5.

Approximately twelve minutes after the stop, Foxx again asked about the search warrant for his house and why officers did not come to his home earlier that day. [U.S. Ex. 1, 12:00] In response, an officer again explained why Foxx was traffic stopped (as opposed to serving the warrant at his home) as well as the procedure for searching the residence. [U.S. Ex. 1, 12:10 to 13:00] The officer explained that Foxx would be taken to his residence, shown the warrant, and told the objects of the search. [U.S. Ex. 1, 12:15] During this exchange, the officer explained that Foxx would be charged with whatever was found during the search of his residence. Foxx then admitted that a gun would be found at the residence, but that it belonged to his nephew. [Record No. 25, p. 5; U.S. Ex. 1, 13:38] One officer then asked about the location of the gun and confirmed that no one was present at the residence to be searched. *Id.* Foxx was transported to his house and presumably shown the subject warrants by detectives.

Foxx now challenges the officers questioning him following invocation of his right to remain silent and his request to speak with an attorney. He asserts that the discussion with

officers at the time of his arrest occurred in violation of his Fifth Amendment right to have an attorney present during questioning. *Id.*

## II. ANALYSIS

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The right against self-incrimination applies when a suspect is subject to a custodial interrogation, unless the defendant knowingly and voluntarily waives his rights. *Miranda v. Arizona,* 384 U.S. 436, 444-45 (1966). The government concedes that Foxx was in custody and validly invoked his Fifth Amendment right to counsel. [Record No. 25, p. 5-6] The only question left to be resolved is whether the defendant was subject to "interrogation" and whether he voluntarily initiated the subject conversation with law enforcement leading up to his statement regarding his knowledge of, and the location of, a firearm at his residence.

To invoke *Miranda* rights there must be an explicit and unambiguous invocation of rights. *See Berghuis v. United States*, 560 U.S. 370, 381-82 (2010) (requiring a suspect to invoke his right to remain silent unambiguously); *Davis v. United States*, 512 U.S. 452, 459 (1994) (holding that to invoke the right to counsel a suspect must do so unambiguously). If the suspect states he wants counsel, the interrogation must cease until an attorney is present. *See Davis*, 512 U.S. at 462. The request for counsel must be clear enough that a reasonable police officer under the circumstances would understand that a request for counsel was made by the suspect. *Id*. at 460. Once counsel is requested, officers can only question the suspect when the attorney is present. *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981). In the present case, the defendant asked "if he needed a lawyer" and if he could call a lawyer. [U.S. Ex. 1, 2:35] He also explicitly stated "I need a lawyer." [U.S. Ex. 1, 2:48] Foxx made a clear

invocation of his right to counsel. Additionally, the United States conceded that the defendant invoked his right to counsel. [Record No. 25, p. 6]

After a suspect has invoked the right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id*. The Supreme Court has held "that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 484-85. After a suspect invokes his right to counsel, "there must be a showing that the suspect himself initiates dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). The suspect must evince a "willingness and a desire for a generalized discussion about the investigation." *Id*. at 1045-46.

Based on the testimony and evidence submitted during the August 31, 2018 hearing, I conclude that the defendant was not subject to improper "interrogation" under *Miranda*. Interrogation includes either "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). It includes words or actions on the part of law enforcement officers "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301. Roadside questioning of a motorist is not generally considered custodial interrogation. *See Berkemer v. McCarty,* 468 U.S. 420, 439-41 (1984).

Here, the focus of the officer's initial questions about weapons concerned officer safety.[1] After concluding the few questions related to safety, the officers did not ask Foxx any questions about the current charges. Instead, they conversed with Foxx about where he grew up, his past criminal history, and about medical issues (i.e., Foxx's low blood sugar). [U.S. Ex. 1, 4:00-11:50] Officer Page testified during the suppression hearing that this general banter was intended to place the obviously nervous defendant at ease. The defendant, on the other hand, repeatedly asked questions and spoke with the police throughout the encounter. [U.S. Ex. 1, 1:50-2:00, 6:22-7:05, 12:00-12:10]

The officers also explained the search warrant procedures to the defendant more than once. [Record No. 25, p. 4] However, based on the totality of the circumstances presented, the Court concludes that these statements were not designed or reasonably likely to elicit incriminating statements from the defendant. Instead, they were in response to the defendants repeated questions. *See United States v. Howard*, 532 F.3d 755 (8th Cir. 2008) (no interrogation when officer's remark was in response to defendant's inquiry about investigation

---

[1] The public safety exception applies when officers have a reasonable, articulable belief they are in danger. See *United States v. Williams*, 483 F.3d. 425 (6th Cir. 2007). "For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id*. In this case, the officers stopped him on a warrant for suspicion of drug activity. Drug activity is often dangerous and involves weapons. Additionally, traffic stops usually "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer v. McCarty*, 468 U.S. 420, 439, n. 29 (1984). The Supreme Court noted that traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). The Court noted that "safety of [an] officer during a traffic stop is a legitimate and weighty interest." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (explaining police may order a driver to get out of the vehicle without violating the Fourth Amendment and officers may pat down the driver if they believe that the driver might be armed and dangerous). Officers may ask questions relating to dangerous weapons when questions are directed toward officer safety. *United States v. Everett*, 601 F.3d 484, 494-495 (6th Cir. 2010).

and was part of conversation attendant to arrest and custody). There was no "interrogation" for purposes of *Miranda* because there was no express questioning by law enforcement or the functional equivalent that was reasonably likely to elicit an incriminating statement from Foxx.

In *United States v. Johnson*, 812 F.2d 1329 (11th Cir. 1986), the Eleventh Circuit held that, once a suspect in custody requests a lawyer, not only must all questioning cease, but officers may not proceed to explain the criminal justice process in an effort to solicit further incriminating statements from the suspect. The holding in Johnson has not been adopted in the Sixth Circuit. However, the facts here are distinguishable. In *Johnson*, the defendant was arrested for armed robbery of a federally-insured credit union occurring in Florida, interstate transportation of a stolen traveler's check, and interstate transportation of a stolen credit card. Johnson was arrested in Colorado. Before his arrest, Johnson and his girlfriend had traveled throughout the south and southwest, using the credit cards and traveler's checks which had been taken during the robbery. At the time of his arrest, Johnson stated that he wanted a lawyer and requested that a lawyer be present during questioning. At the same time, however, he stated that, "I know all about the checks and where they came from." Thereafter, an FBI agent asked Johnson if he would like to have the federal criminal process explained. He responded "yes," and the agent proceeded to explain it to him. This included a statement from the agent that the FBI was involved because the credit union was federally insured. In response, Johnson stated, "All this trouble for trying to get some money."

Although a similar legal issue is presented in this case, the conversations with Foxx are factually distinct. The officers were not aware of the details of the investigation and were acting in good faith. A review of the body camera footage establishes to the Court's satisfaction that the explanations given regarding the criminal process was directly related to

Foxx's repeated inquiries regarding the upcoming search of his residence. It appears that Foxx was aware of what would likely be found in the home and it appears that he was attempting to elicit all information possible *from the officers* before the search occurred. The Eleventh Circuit recognizes that whether "interrogation" results from a police officer's interaction with a suspect is a fact-intensive inquiry. *United States v. Fonseca*, 727 Fed. App'x 985 (11th Cir. 2018).[2]

For example, in another "*Johnson*" case, *United States v. Johnson*, 702 F. App'x 349, 357 (6th Cir. 2017), the defendant invoked his right to counsel and then immediately asked why he was being questioned. The officers told him that they could not talk to him without an attorney present but offered an explanation. *Id*. The defendant continued to ask questions of the law enforcement officers, then the officers asked him to sign a waiver form. *Id*. There, the Sixth Circuit found that the officers ceased questioning the defendant and the defendant re-initiated questioning. *Id*.

In this case, Foxx clearly wanted to continue the dialogue with the officers present at the scene about the on-going case. The officers, on the other hand, were discussing unrelated topics. Officer Page noted during the suppression hearing that the search warrant procedure was discussed with Foxx because the defendant repeatedly asked about the impending search of his home. Similar to the Sixth Circuit's holding in *Johnson*, 702 F. App'x at 357, the undersigned concludes that the Lexington officers were not seeking to elicit statements from

---

[2] While not all discussions will result in Fifth Amendment violations, the undersigned agrees that "police officers should refrain from explaining the criminal justice process immediately after a suspect invokes his *Miranda* rights." Id. at 991. This would certainly narrow the scope of the inquiry into the officer's subjective intent (*i.e.*, was the officer intending to elicit incriminating statements in response to the information he or she was providing?) but in practice, it would not end the inquiry entirely.

the defendant but were merely attempting to answer the defendant's repeated questions. The officers' actions were in response to the defendant's repeated inquiries that the officers produce and discuss the search warrant regarding the defendant's home. The defendant demonstrated a desire and willingness to discuss the present case and thus he re-initiated the conversation that included the subject statement regarding his knowledge of the firearm located at his home.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that the defendant's motion to suppress [Record No. 20] is **DENIED**.

Dated: September 5, 2018.

Signed By:
*Danny C. Reeves*
United States District Judge